2000 OK CR 5

**Paris Lapriest POWELL, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–97–763.**

Court of Criminal Appeals of Oklahoma.

Feb. 2, 2000.

Rehearing Denied March 15, 2000.

516

An Appeal from the District Court of Oklahoma County; The Honorable Virgil C. Black, District Judge.

Robert J. Moldfelt, Michael McBride, Asst. Public Defenders, Oklahoma City for Appellant at trial.

Brad Miller, Asst. Dist. Atty., Oklahoma City, for the State at trial.

Andrea Digilio Miller, Asst. Public Defender, Oklahoma City, for Appellant on appeal.

W.A. Drew Edmondson, Atty. Gen., William L. Humes, Asst. Atty. Gen., Oklahoma City, for the State on appeal.

**OPINION**

LUMPKIN, Vice–Presiding Judge:

¶ 1 Appellant, Paris Lapriest Powell, was tried by a jury and convicted of First Degree Murder (malice aforethought) (Count I) in violation of 21 O.S.1991, § 701.7, and Shooting with Intent to Kill (Count II) in violation of 21 O.S.1991, § 652 in Case No. CF–93–3926, District Court of Oklahoma County. The jury found the existence of one aggravating circumstance, that Appellant knowingly created a great risk of death to more than one person, and recommended the punishment of death. The trial court sentenced Appellant in accordance with this recommendation. Appellant now appeals his convictions and sentences.[1]

¶ 2 On June 25, 1993, two youths were gunned down in a drive-by shooting on Southeast 22nd Street in Oklahoma City. Fourteen year old Shauna Farrow died at the scene when a bullet penetrated her chest and passed through her heart and lungs. Seventeen year old Derrick Smith was shot in the hip, resulting in extensive injuries to his leg. He was placed in a body cast, and his leg injury required the permanent placement of a metal rod and pin.

¶ 3 Derrick Smith had known Appellant for six or seven years and was in contact with him every day for about eighteen months prior to the shooting. Smith was not a friend of Appellant, nor did Smith even like him. Smith had also known Yancey Douglas for about eight years and saw him every day. Douglas used to stay with Smith's aunt from time to time.

¶ 4 At the time of the incident, Smith was a member of the Southeast Village Crips (SEV). Appellant and Douglas were members of the 107 Hoover Crips. The SEVs and the 107 Hoovers are not rival gangs; they help each other out on occasion when there is a dispute with another gang. However, Smith claimed the two gangs were locked in a dispute in June of 1993. Carlos Morris, a 107 Hoover, had been shot and killed by Valdez Wilburn, an SEV, two weeks earlier.

¶ 5 Smith testified that on the day of the shooting, he went to the Ambassador Courts Apartments to hang out with his friends, smoke marijuana, and sell crack. This was apparently Smith's normal daily routine. At the time, he was carrying crack cocaine on his person and a .380 caliber automatic pistol. Smith testified he was not particularly concerned about the dispute between his gang and the 107 Hoovers because he had still been hanging out with Yancey Douglas.

¶ 6 Upon arriving at the apartments, Smith smoked between eleven to fifteen marijuana cigarettes, and he also drank some Everclear alcohol. He testified he was intoxicated, "somewhat" high and drunk, but not out of touch with reality. He recalled how he and a friend had been talking with Shauna Farrow.

¶ 7 At about 11 p.m., Shauna left the apartments and began walking home. Smith joined her, pushing along his little sister's ten speed on the way. Smith testified there were numerous street lights in the area.

¶ 8 Just before arriving at his home on Southeast 22nd street, a car approached Shauna and Smith from behind, heading east. Smith recalled hearing a song coming from the car, a song he associated with Yancey Douglas. Smith testified it was an old song by Ice Cube that Yancey Douglas used to listen to and like. Smith described the car as a gray hatchback, possibly a Datsun. He identified State's exhibit 2, a photograph of a blue Dodge Omni, as the car he saw.

¶ 9 As the car passed, Smith could not see any faces inside. He only saw shadows. The car went over a hill and turned around. Smith saw the car's headlights reflect off a house as it turned. The car pulled up to Smith and Shauna and then stopped. After a pause of two or three seconds, the driver's door opened up and Smith recognized Appel-

1. Appellant's Petition in Error was filed in this Court on November 25, 1997. Appellant's brief was filed on October 14, 1998. The State's brief was filed on February 11, 1999. Appellant's reply brief was filed on March 31, 1999. The case was submitted to this Court on April 7, 1999, and oral argument was held on September 28, 1999. Oral argument was originally scheduled for July 27, 1999, but was reset at Appellant's request due to his appeal counsel's maternity leave.

lant and Yancey Douglas. Douglas was sitting in the passenger seat, and Appellant was driving. Smith also saw a shadow of another passenger from the back seat. At that point, lights of fire jumped out of the car from the hands of the car occupants. Smith said he was immediately hit by one of the gunshots, estimating there had been some fourteen or fifteen shots. He heard bullets whizzing by his ears. Smith lay on the ground, pretending he was dead. As the car drove off, Smith heard a high-pitched voice similar to Douglas's voice say, "fuck 'em."

¶ 10 Smith attempted to crawl away from the scene, leaving his 2.5 gram bag of crack cocaine behind in the process. Neighbors assisted him. Meanwhile the car drove up several houses, and the doors opened. Smith said it looked as though the car had changed drivers. Smith threw his gun over a fence. The gun was never located.

¶ 11 During cross-examination, defense counsel brought out some inconsistencies between Smith's trial testimony and his previous statements. At the preliminary hearing, Smith testified the car had a little ruffle in the back and on the sides. During trial, he said there was no ruffle in the back. Smith initially told an officer the gray two-door hatchback was followed by a beige car, possibly a Grand Prix. Smith also told one officer he was only fifty percent sure Appellant was the driver of the car. Smith admitted telling Joanne Marie Paul he could not tell who was in the car that night. Further, Smith admitted he had given an incorrect statement regarding seeing Appellant and Anthony Highsaw in the hatchback on previous occasions.

¶ 12 Randy Gregg lived on Southeast 22nd on the night of the shooting. At around midnight, he was sitting watching television in his bedroom when he heard the sound of firecrackers right in front of his house. He jumped up and looked out the window. He saw a small, dark colored car leaving in a hurry. He also saw two kids. One was laying at the edge of the street, and the other was crawling up the street. By listening to the gunshots, Mr. Gregg thought there was more than one gun involved in the shooting.

¶ 13 Tim Love is a plastic surgeon at Baptist Hospital in Oklahoma City. He testified how Appellant arrived at Baptist Hospital in the early morning hours of June 25, 1993, seeking treatment for a gunshot wound to the hand. Appellant gave his name as Marty Powell. The records showed that Appellant arrived at the emergency room at 1:32 a.m. Love testified that the entry point of the wound was high on the hand, somewhere between the wrist and the knuckles. The exit point was at the lower end of the hand, toward the little finger, adjacent to the fourth knuckle. Both the entry and exit points were on the back of the hand. The injury broke two bones. Love's notes indicated Appellant had been shot at close range with a handgun.

¶ 14 E.R. was a school mate of Shauna Farrow. E.R. testified that on the night of the shooting, she saw Yancey Douglas and some members of the Hoover Crips standing in a parking lot. Douglas said, "Are y'all ready to do this?" Douglas said something about going to the south side. He and two other men hopped into a bluish-gray hatchback and drove off. It was approximately 8:45 p.m. As they left, Douglas fired a gunshot out of his window. E.R. identified the car depicted in State's exhibit 2 as the car she saw that evening. After learning Shauna Farrow had been murdered, E.R. called a police hot line and told them what she knew.

¶ 15 W.M. corroborated much of E.R.'s story. She also saw Yancey Douglas and other members of the 107 Hoovers at 8:45 p.m. on the night of the shooting. Douglas said something about going to the south side and "that he had got into it with some more gang members on the south side." W.M. saw Douglas and two other black males get inside a gray or blue two door hatchback. Douglas was carrying a gun. He started "talking trash" and threatened to shoot up their house. As the car drove away, two shots were fired. W.M. stated the car depicted in State's exhibit 2 looked like the car Douglas was driving in that night.

¶ 16 A.L. testified that on the day before the shooting, she was with her sister and two friends at the Ambassador Courts Apartments. Her two friends were members of the SEV Crips. Sometime after ten, A.L.,

her sister, and her two friends were walking to A.L's grandmother's house when she heard Yancey Douglas approach in gray two-door car. A.L. knew Douglas because he used to live with her. She heard someone in the car say, "there go them SEV niggers." A.L. saw Douglas pointing a gun out the window toward the ground. He said, "Them is Nut's sisters, put the guns up." A.L.'s friends took off running. A.L. identified the car depicted in State's exhibit 2 as the car she saw that evening.

¶ 17 Gordon Robertson is a firearms examiner in the forensic services division of the Oklahoma City Police Department. He examined shells and bullet fragments gathered from the victims and the crime scene. Robertson concluded there was "an absolute minimum of three firearms involved in firing or ejecting the evidence that we have here."

¶ 18 Leon Washington owns a garage in Oklahoma City. He testified that in June of 1993, Appellant worked for him at the garage. Washington loaned Appellant vehicles to drive from time to time. Right before the incident, Washington loaned Appellant a blue Dodge Omni, identified as the car in State's exhibit 2. Yancey Douglas and "another dude" returned the Omni to Washington on the same day Washington found out Appellant had been shot. When police came looking for the car, Washington had already sold it to a relative. The car was not recovered until two years had passed.

¶ 19 Lawrence Kirkendoll testified that on June 25, 1993, between 12:15 ad 12:45 a.m., he was asleep at his home when the doorbell rang. Appellant and Yancey Douglas were standing on his porch. Appellant had been shot. He had a T-shirt and sweat pants wrapped around his hand. Appellant and Douglas asked Kirkendoll if he could take them to the hospital. Kirkendoll said he would. As they went outside, Kirkendoll saw Appellant's car, which he affirmatively identified as the car depicted in State's Exhibit 2. He had seen the car at Washington's Body Shop on previous occasions. Someone was sitting in the back seat of the car. Douglas drove off in the Dodge Omni with the third person, and Kirkendoll drove Appellant to the hospital. Kirkendoll stayed with Appel-

lant at the hospital until about 3:00 a.m. He then returned home and found the clothing Appellant had wrapped around his hand.

¶ 20 When Kirkendoll found out what had happened the night before, he put the clothes in a bag and gave them to a friend, stating "I didn't want that stuff around my house." Kirkendoll also testified regarding threats he had received from Appellant while Appellant was in jail. Appellant stated he would serve fifteen years and then he was going to come "smoke" Kirkendoll and his family. Appellant asked Kirkendoll not to go to court and suggested ways in which he could avoid it. Appellant also suggested Kirkendoll should come to court all dirty, say he didn't remember, and fail to pick Douglas out of a lineup. Kirkendoll initially agreed to do this for Appellant, but later changed his mind.

## JURY SELECTION ISSUES

### A.

¶ 21 In his first proposition of error, Appellant claims he was denied due process under the Sixth and Fourteenth Amendments to the U.S. Constitution when an insufficient record was made to determine if prejudice arose as a result of improper communications between the victim's mother and a potential juror. He claims no inquiry was made regarding the extent of the conversation between the potential juror and the victim's mother. He also claims others may have overheard the conversation or had similar conversations. He specifically points to an off-the-record discussion which took place after the potential juror and the victim's mother were questioned by the trial court and attorneys in camera.

¶ 22 This proposition of error is without merit. Both the victim's mother and the potential juror were thoroughly examined regarding this issue, and the record reflects the conversation, although improper, was inconsequential. Appellant's counsel had the opportunity to ask the victim's mother if she had similar communications with other potential jurors. Indeed, Appellant's counsel could have asked the entire jury panel if they had engaged in a conversation with the victim's mother or overheard her speaking to

another. Counsel opted not to ask these questions. Furthermore, the State, over Appellant's objection, exercised a peremptory challenge to excuse the prospective juror.

¶ 23 Appellant has failed to show actual prejudice he suffered as a result of this issue. *Al–Mosawi v. State,* 1996 OK CR 59, ¶ 32, 929 P.2d 270, 280. Appellant was not deprived of his Constitutional rights when an off-the-record discussion following the in camera interview was not recorded. Any suggestion that this conversation had anything to do with the victim's mother is purely speculative.

## B.

¶ 24 In his second proposition of error, Appellant claims he was denied a fair and impartial jury when the trial court allowed the removal of five prospective jurors for cause before it was adequately established they could not follow the law and consider the death penalty along with other punishments for first degree murder. He claims the trial court's actions violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, §§ 7, 9, 19 and 20 of the Oklahoma Constitution.

¶ 25 The proper standard for determining whether a prospective juror should be excluded for cause based upon his or her views on capital punishment is when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). This Court looks to the entirety of the juror's *voir dire* examination to determine if the trial court properly excused the juror for cause. *Patton v. State,* 1998 OK CR 66, ¶ 16, 973 P.2d 270, 281. As the trial court personally observes the jurors and their responses, this Court will not disturb its decision unless there has been an abuse of discretion. *Id.*

¶ 26 Here, the trial court did not abuse its discretion in excusing prospective jurors Bernardy, Harris, Lindell, Perkins, and Shelton for cause. Each juror stated, quite emphatically, that he or she could not give meaningful consideration to the death penalty as a possible punishment in this case. ¶ 27 Prospective juror Bernardy testified, "I do not believe in the death penalty." He could not vote for the death penalty under any circumstances, stating "I work for the Methodist Church, and I'm totally opposed to it." Prospective juror Lindell stated, "I would not assess the death penalty." It did not matter if a million people had been killed.[2] Prospective juror Perkins said he could not vote to assess the death penalty and could not give equal consideration to all three punishments. He stated, "I could not hand down the death penalty to anybody." When asked if that opinion was regardless of the case or the facts, Perkins stated, "Unless it was my children, then I'd kill them." Prospective juror Shelton said she could not imagine a situation where she could consider imposing the death penalty. She could not consider the death penalty "regardless of the facts, whether it was a hundred or two hundred or a thousand people."

¶ 27 Appellant's only possible grievance lies with prospective juror Harris. She stated she did not think she could assess the death penalty. She indicated she did not think she could personally vote for the death penalty and that to vote for the death penalty would do violence to her conscience. She only wavered when asked whether she could consider the death penalty if the defendant had theoretically killed hundreds of people. Prospective juror Harris then replied, "Maybe then, yes." However, she then stated, "I don't think I can."

¶ 28 Considering the totality of *voir dire,* we find the trial court did not abuse its discretion. Furthermore, in light of the entire record, we find the trial court did not err by asking potential jurors if they could give

2. The record appears to have two typos here. On Page 81, line 7, of the transcript, a question is posed to "Mr. Lindell," but the answer comes from prospective juror Harris. The answer to defense counsel's follow-up question is also attributed to Mrs. Harris. For purposes of this opinion, we have attributed these comments to Mr. Lindell. If they did indeed come from Mrs. Harris, they are further evidence of her inability to give consideration to the death penalty.

"equal consideration" to the three sentencing options. We also reject Appellant's ineffective assistance of counsel argument relating to his counsel's failure to object to the trial judge's decision to excuse prospective jurors Bernardy and Perkins *sua sponte.* Appellant has failed to show errors by counsel which were so serious as to deprive Appellant of a fair trial, a trial whose result is reliable. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

### C.

¶ 29 In his third proposition of error, Appellant claims he was denied a fair and impartial jury when the trial court refused to excuse four prospective jurors for cause, thereby forcing Appellant to use four of his peremptory challenges. He claims the trial court abused its discretion by denying Appellant additional peremptory challenges and thus violated the Sixth and Fourteenth Amendments of the U.S. Constitution and Article II, §§ 7, 19 and 20 of the Oklahoma Constitution.

¶ 30 Specifically, Appellant claims prospective jurors Mildram, Reherman, Knopp, and Dahlke should have been removed for cause because they "indicated that they would have a difficult time considering life." He further claims prospective juror Reherman had close ties to Oklahoma County District Attorney Robert Macy.

¶ 31 Appellant's argument concerning prospective juror Dahlke is wholly without merit as the record reflects Ms. Dahlke was removed from the jury for cause based upon her inability to consider a life sentence. With respect to the remaining three prospective jurors, using the same legal standards we applied in proposition two, we again find the trial court did not abuse its discretion in failing to remove these prospective jurors for cause.

¶ 32 Prospective jurors Mildram and Knopp each stated quite clearly that they could consider all three punishment options and that they were not predisposed to give a death sentence.[3] The record does not support Appellant's bare statement that Mildram or Knopp indicated they would have a difficult time considering life. Indeed, Appellant's trial counsel passed each for cause. Both prospective jurors were willing to consider all the penalties provided by law and were not irrevocably committed to one punishment option before the trial has began. *Gilbert v. State,* 1997 OK CR 71, ¶ 26, 951 P.2d 98, 108.

¶ 33 It is true Prospective juror Reherman appeared to have political ties to District Attorney Robert Macy. Reherman had contributed to Mr. Macy's campaigns and had actually worked on the campaigns by putting up signs and helping conduct fundraisers. Reherman was on a first name basis with Mr. Macy and had visited the District Attorney's office on several occasions. However, these visits appear to be linked to Reherman's former position as mayor of the city of Edmond.

¶ 34 Nevertheless, Appellant cites no statutory provision which would require the trial court to dismiss Reherman from the jury for cause based upon his political ties. Our statutes set forth numerous reasons for dismissing a prospective juror for implied bias, but none of these reasons seem particularly applicable to Reherman, at least on the record before us. See 22 O.S.1991, § 660. Reherman indicated he could consider all three possible punishments if there was a conviction, and he would vote his conscience. He indicated his associations with law enforcement would not affect him and he could follow the Judge's instruction on the law. The trial court did not abuse its discretion.

### D.

¶ 35 In his fourth proposition of error, Appellant claims he was denied an impartial jury composed of a fair cross-section of the community in violation of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and Article II, §§ 7, 9, 19 and 20 of the Oklahoma Constitution. He notes seven African Americans were excused from the jury panel. Three were removed for cause, and four were excused by use of a peremptory challenge. Of these four, Appel-

---

**3.** Tr. III at 486, 487, 490, 494, 500, 502, 503, 582, 587, 588, and 594.

lant claims the State failed to give a race neutral reason for the dismissal of prospective jurors Northington and Traylor.

¶ 36 Concerning prospective juror Traylor, the record reflects she was one of six jurors in a panel from which two alternate jurors were chosen. The trial court required each side to exercise two mandatory peremptory strikes in order to reduce the number from six to two.[4] The State used its first strike to remove Traylor. However, before the State was allowed to offer a race neutral reason for excusing the juror, as required by *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S.Ct. 1712, 1716, 90 L.Ed.2d 69, 80 (1986), the trial court stated, "Before we ever get into that, Ms. Traylor's a niece of one of the defendant's witnesses." Defense counsel then pointed out the witness was also listed by the State. The State indicated it did not intend to call the witness, but the defense was still considering calling the witness. From this record, it is clear the State's purpose in dismissing Ms. Traylor was because of her relationship to a witness, not her race. Moreover, there was no prejudice as there is no showing either of the alternate jurors were required to replace any of the regular jurors on the jury.

¶ 37 With respect to prospective juror Northington, the State concedes "the record is less than clear as to the basis of the removal." Along this same line, we note the procedure in which Northington was removed was different from that used to select the twelve jurors who would hear the case. A detailed explanation is necessary to properly analyze this alleged error.

¶ 38 The record shows the State waived its ninth and final peremptory challenge on the third day of trial.[5] The defense then used its

ninth peremptory challenge to remove prospective juror Werner. Prospective juror Hoang was called in and dismissed for cause. Prospective juror Dahlke was then called and became the final juror after surviving defense counsel's challenge for cause.[6]

¶ 39 At this point, the trial court called in six prospective jurors in order to fill two alternate juror positions.[7] Three of these prospective jurors were dismissed for cause, leaving prospective jurors Meier, Ringwald, and Magnus in the alternate jury pool. Three new prospective jurors were then called, Ms. Branscum, Mr. Sipes, and Ms. Northington. After these prospective jurors were questioned at length, both the State and the defense passed them for cause.[8]

¶ 40 As stated above, the trial court had established a system which required each side to exercise two mandatory peremptory strikes to reduce the pool of six alternate jurors to two. However, before the attorneys began the process of exercising their mandatory peremptory strikes, the trial court and attorneys took a recess to investigate an issue which had arisen with respect to two seated jurors. Following this recess, an in camera hearing took place in which two jurors, Ms. Cooke and Ms. Dahlke, indicated reservations about serving on the jury. Both jurors expressed doubt about their ability to assess a penalty of life if a first degree murder conviction was obtained. Both jurors were dismissed for cause, thereby leaving two spots open on the jury.[9]

¶ 41 In an effort to replace jurors Cooke and Dahlke, the trial court apparently used the same method it had established for choosing alternate jurors. Both sides were given two mandatory strikes in order to fill the two remaining slots on the jury. The

---

4. This procedure appears to have been taken from the procedure outlined in 12 O.S.1991, § 575.1(b) for civil cases.

5. Tr. IV at 754.

6. Tr. IV at 782.

7. It should be noted this "alternate juror" pool of six was not the same alternate juror pool we discussed above in relation to the removal of prospective juror Traylor. Northington's juror

pool was supposed to have been used to select two alternate jurors. However, as discussed below, when two jurors who had already been seated on the case indicated an inability to serve, Northington's juror panel was used to fill those two vacancies. Thereafter, the two alternate juror positions were selected from prospective juror Traylor's panel of six.

8. Tr. IV at 809, 818.

9. Tr. IV at 836.

State removed prospective juror Meier, and the defense removed prospective juror Magnus. Of the four remaining prospective jurors, the State chose to remove Ms. Northington. Defense counsel then objected on Batson grounds. The State responded, "But I'm forced to make a selection, Judge." The trial court then stated, "Between a rock and a hard place, last one." Defense counsel moved for a mistrial, and the trial court overruled this motion.

¶ 42 These facts present a question which has not previously been presented to this Court. Under normal circumstances, each party is given nine peremptory challenges to exercise at their discretion. 22 O.S.1991, § 655. These challenges allow the attorneys to dismiss jurors for basically any constitutionally permissible reason.[10] Peremptory challenges may, of course, be waived.

¶ 43 Here, however, the State was required to exercise two mandatory peremptory strikes in order to reduce the pool of six prospective jurors down to two replacements. In excusing Ms. Northington, the State offered an arguably race-neutral explanation: this was a forced selection, a peremptory challenge which could not be waived.

¶ 44 Even if the State's proffered reason is not considered sufficiently "race-neutral," the record reflects Appellant failed to carry his ultimate burden of establishing a prima facie case of purposeful discrimination. *Batson,* 476 U.S. at 96–97, 106 S.Ct. at 1723. While Appellant and Ms. Northington are both African Americans, Appellant's trial counsel offered little more than that bare fact to support his charge.

¶ 45 We do not know, for instance, if any of the three other prospective jurors from which the State could have exercised its last peremptory challenge were African Americans or not. Counsel pointed to no questions by the State which would create an inference of purposeful discrimination. There is no clear "pattern" of racially-tied strikes. Appellant's own brief essentially admits five of the seven African Americans excused from the jury were removed on proper grounds. The sixth was related to a defense witness.

We do not even know how many African Americans were seated among the twelve jurors.

¶ 46 Under *Batson,* once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination. *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995); *see also Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral"). Here, Appellant failed to make out a prima facie case of racial discrimination, and the State offered an arguably race-neutral explanation. The trial judge then decided Appellant had failed to prove purposeful racial discrimination and overruled Appellant's objection and motion for mistrial. We must give great deference to the trial court's finding of fact. *Id.* at 364–372, 111 S.Ct. at 1868–1872. In so doing, we find no abuse of discretion.

## FIRST STAGE TRIAL ISSUES

### A.

¶ 47 In Proposition five, Appellant claims there was insufficient evidence admitted at trial to support his convictions, thereby violating the due process clause of the Fourteenth Amendment and corresponding provisions of the Oklahoma Constitution. He claims his convictions necessarily relied on an aiding and abetting theory, but there was no showing he had a specific intent to kill Shauna Farrow.

¶ 48 Because the evidence at trial was both direct and circumstantial, the test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the

---

**10.** Race is not a constitutionally permissible reason.

essential elements of the crime charged beyond a reasonable doubt. *Barnett v. State*, 1993 OK CR 26, ¶ 15, 853 P.2d 226, 231. Furthermore, as we stated in *Conover v. State*, 1997 OK CR 6, ¶ 18, 933 P.2d 904, 910–11:

> All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals and are equally culpable with other principles. *Rounds v. State*, 679 P.2d 283, 286–87 (Okl.Cr.1984); 21 O.S.1991, § 172. Mere presence or acquiescence, without participation, does not constitute a crime. However, only slight participation is needed to change a person's status from a mere spectator into an aider and abettor. *Hackney v. State*, 874 P.2d 810, 814 (Okl.Cr.1994); *McBrain v. State*, 763 P.2d 121, 124–125 (Okl.Cr.1988). "Aiding and abetting in a crime requires the State to show the accused procured it to be done, or aids, assists, abets, advises or encourages the commission of the crime." *Hindman v. State*, 647 P.2d 456, 458 (Okl.Cr.1982).

¶ 49 Here, Appellant's convictions are sufficiently supported by the evidence. Derrick Smith testified that at the time of the shooting he recognized Appellant in the driver's seat of the car depicted in State's exhibit 2. Yancey Douglas and one unidentified person were also in the car. Smith identified the car as the same one which had been loaned to Appellant by Leon Washington. Smith estimated fourteen or fifteen shots were fired. After the shooting ended, he saw the car stop a few houses away, and the doors opened. Smith said it looked as though the car's driver then changed. According to Randy Gregg and Officer Jeff Tanksley, the shots occurred at about midnight or a little before.

Lawrence Kirkendoll testified Appellant arrived at his home at 12:15 to 12:45 a.m. Appellant's hand had a gunshot wound. Furthermore, Gordon Robertson testified that there were a minimum three firearms used in the shooting.

¶ 50 This evidence shows Appellant was a principal to Shauna Farrow's murder and Derrick Smith's shooting. At the very least, he aided and abetted the others in the Dodge Omni in committing these crimes.[11] Furthermore, there is sufficient evidence that Appellant acted with malice aforethought and a specific intent to kill. This proposition is denied.

### B.

¶ 51 In Proposition six, Appellant claims the trial court improperly admitted evidence regarding threats Appellant allegedly made to Lawrence Kirkendoll.[12] He claims this error violated Appellant's due process and confrontation rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and the corresponding provisions of the Oklahoma Constitution.

¶ 52 Appellant first complains Kirkendoll's allegations of threats were admitted into evidence in violation of the Oklahoma Evidence Code and *Allen v. District Court*, 1990 OK CR 83, 803 P.2d 1164. Of course, *Allen* has been superceded by the Oklahoma Criminal Discovery Code, 22 O.S.Supp.1994, § 2001 et seq.[13] Applying these provisions, 22 O.S.Supp.1994, § 2002(D) sets out, "All issues relating to discovery, except as otherwise provided, will be completed at least ten (10) days prior to trial." Where a party does not comply with discovery, Section 2002(E)(2) allows the trial court discretion to provide certain remedies, including the entry of

---

11. In his Supplemental Authorities After Oral Argument, Appellant cites to *United States v. Andrews*, 75 F.3d 552, 556 (9th Cir.1996) and *Woods v. State*, 8 Cal.App.4th 1570, 11 Cal. Rptr.2d 231, 235–40 (Cal.App. 3 Dist.1992) in relation to his conviction as an aider and abettor. Both cases are factually distinguishable and do not further Appellant's cause.

12. Kirkendoll is sometimes referred to as Lawrence "Kuykendall" in the record. This alternative spelling was also used in the trial of Yancey Douglas.

13. We assume Appellant's references to the Oklahoma evidence code are actually intended to address the criminal discovery code, as Appellant later addresses the evidence code in Proposition VI(B).

"such other order as it deems just under the circumstances."

¶ 53 On August 4, 1994, Appellant's trial counsel filed a motion for discovery in which he requested "endorsement of names and addresses of all witnesses the State of Oklahoma intends to use at trial no later than 30 days prior to trial, together with their relevant oral, written, or recorded statements, or summaries of the same."[14] On May 1, 1995, the State listed Lawrence Kirkendoll as a witness. Kirkendoll also testified in Yancey Douglas's trial in mid 1995.

¶ 54 On April 17, 1997, Appellant filed a motion for the disclosure of impeaching evidence in which he requested the State to disclose "[a]ny and all threats, express or implied, direct or indirect, or other coercion made or directed against the witnesses...."[15] Appellant also filed a discovery motion that same date which requested disclosure of any oral statements made by Appellant prior to trial. This is consistent with statutory discovery requirements. See 22 O.S.Supp.1996, § 2002(A)(1)(c).

¶ 55 On April 22, 1997, the State filed its "Summary of Stage One Witnesses Testimony."[16] On April 28, 1997, i.e. seven days prior to trial, the State filed a "Second Addendum Summary of Stage One Witnesses Testimony." Therein, the State disclosed new matters about which Lawrence Kirkendoll would testify.[17]

¶ 56 The question is whether Appellant's counsel received sufficient notice of certain threats Appellant allegedly made to Kirkendoll. This is important because Kirkendoll testified at Appellant's trial that Appellant had called him before Yancey Douglas's trial and said that, as his friend, he couldn't believe Kirkendoll was "scratching him out like that."[18] Kirkendoll also testified Appellant stated he would only serve fifteen years and, after that, he was "going to come smoke me and my family."[19] Kirkendoll further testified that within two months prior to Appellant's trial, Appellant told Kirkendoll to tell the prosecutors Appellant's threat to come smoke Kirkendoll and his family had never happened. [20] Appellant timely objected to each of these statements on the basis of insufficient notice.

¶ 57 While Appellant did not receive the State's addendum relating to Kirkendoll's testimony at least ten days prior to trial, as required by 22 O.S.Supp.1996, § 2002(D), the record is unclear exactly when Kirkendoll's revelations to the State actually took place. The addendum indicates Kirkendoll spoke with Appellant "in late March or early April, 1997." However, at trial Kirkendoll testified he had four or five conversations with Appellant in April, 1997. These conversations took place over approximately one week's time. He also testified the conversations were "one month ago," which would mean they took

---

14. O.R., Volume 1, at 8.

15. Appellant implies this language covered threats made by Appellant to Kirkendoll, but it is unclear whether this language was intended to cover threats made by Appellant.

16. For some reason, this document does not appear in the record. However the fact of its filing is noted in the index. O.R., Volume IV, at 652.

17. "In late March or early April, 1997, Paris Powell called Lawrence Kirkendoll's home. The call was collect from the jail. Powell told the witness to claim in trial that his previous telephone threats issued to the witness prior to Yancey Douglas' trial were over a debt Kirkendoll owed Powell. This was not true. This was designed to cover up the true intent of the threats ... to intimidate Kirkendoll from testifying to what he knew about the events of June 24, 1993.

Powell wanted the witness to agree to be 'kidnapped' by Powell's 'homeys'. Powell wanted the witness to allow himself to be concealed in a motel and tied up until after the trial. Powell said his 'homeys' would call the police about the witness's whereabouts after the trial was over.

As another option, Powell wanted the witness to appear in court unkept, unshaven, and in disarray. Powell instructed the witness to answer the State's questions as if he didn't remember or didn't know the answers. Powell told the witness he would be shown a photo lineup of Yancey Douglas look-a-likes in court. Powell told the witness to purposely identify anyone but Yancey as the person who brought Powell to the witness's home June 25, 1993. Powell told the witness that if he would lie about Yancey's identity, he would be acquitted. Powell said if he did not lie, he would be convicted."

18. Tr. VI at 1483.

19. Tr. VI at 1485.

20. Tr. VI at 1489.

place around April 14.[21] Kirkendoll informed the State of the conversation about three or four days later.[22] Therefore, the record indicates the State notified Appellant of these conversations shortly after learning of them.

¶ 58 Kirkendoll did not testify until May 14, 1997. This was sixteen days after the addendum was filed.[23]

¶ 59 While the addendum does not state the precise words Appellant allegedly used in his threats to Kirkendoll, it does reference, in general terms, threats Appellant made "prior to Yancey Douglas' trial." The record also indicates Appellant's counsel had been provided copies of the Douglas trial transcripts at some point. In that trial, Kirkendoll supposedly testified how Appellant had been calling him and threatening him. Unfortunately, we do not know the precise context of that testimony. The Douglas transcripts were not admitted as part of the record in Appellant's trial, and they have not been made a part of the record in this appeal.

¶ 60 Appellant filed a Notice of Cross–Reference on December 8, 1998, in which he indicates the Douglas transcripts are "essential for the Court to have a full meaning of the issues before it." However, Rule 3.3, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (1998) is not applicable in this situation. Appellant and Yancey Douglas are co-defendants who had separate trials, severed at the request of Douglas's counsel. In order for us to consider the Douglas transcripts, Appellant should have filed a motion to supplement the record under Rule 3.11, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (1998). This was not done.

¶ 61 Nevertheless, while Appellant claims he had "absolutely no notice of these statements beyond what was contained in the State's Second Addendum of Mr. Kirkendoll's testimony," the record reflects he at least knew Kirkendoll had alleged prior threats had been made. While the State's addendum or summary of testimony could have been more explicit about what Appellant's threats were, it would be difficult to say Appellant was denied due process.

¶ 62 Appellant had at least sixteen days from the filing of the addendum to find out what the precise nature of those threats were. Other matters pertaining to Kirkendoll's testimony were argued before the court during the first day of trial, but this precise issue was not. Moreover, Appellant did not seek inclusion of the Douglas transcripts in the record. The State asserts this issue came out during Douglas's trial, but Appellant's counsel claims it did not.[24] However, we will not simply presume error occurred.[25] Thus, we find the trial court did not abuse its discretion by failing to grant Appellant relief under the criminal discovery code based upon lack of notice of Kirkendoll's statements.

■ ¶ 63 Appellant next complains the evidence of alleged threats against Kirkendoll constitutes inadmissible other bad acts evidence under 12 O.S.1991, § 2404(B). He further claims the State failed to give him ten days notice of its intent to use such evidence, as required by *Burks v. State,* 1979 OK CR 10, ¶ 12, 594 P.2d 771, 773, *overruled in part on other grounds in Jones v. State,* 1989 OK CR 7, ¶ 7, 772 P.2d 922, 925.

¶ 64 We have already addressed the timing of the State's notice in reference to the discovery code. The record reflects the State gave Appellant notice shortly after learning of Kirkendoll's conversations with Appellant in April, 1997.

---

**21.** Tr. VI at 1516.

**22.** Tr. VI at 1512.

**23.** Appellant may have been given notice by telephone prior to this time as the record reflects the prosecutor called defense counsel sometime before filing the addendum. Tr. VI at 1520. On this point, defense counsel indicated he did not know how long it took the State to type up the addendum. Tr. VI at 1522.

**24.** The State's brief goes so far as to quote from excerpts of the Douglas trial.

**25.** We should also note Appellant filed three supplemental witness lists less than ten days prior to the trial. These documents listed additional defense witnesses and their proposed testimony.

¶ 65 The purpose of a *Burks* notice is to prevent surprise on the part of the defense, and to allow the defense to be heard prior to the evidence being placed before the jury. *McClendon v. State*, 1989 OK CR 29, ¶ 16, 777 P.2d 948, 952; *Pickens v. State*, 1988 OK CR 35, ¶ 4, 751 P.2d 742, 743. On the record before us, Appellant cannot claim he was surprised by this testimony. Appellant had the opportunity to request a continuance based upon information in the addendum, but did not.

¶ 66 Concerning the admissibility of Appellant's threats as other bad acts under 12 O.S.1991, § 2404(B), this question was resolved in *Gideon v. State*, 1986 OK CR 112, ¶ 10, 721 P.2d 1336, 1338. There, we found such acts are "admissible to infer a consciousness of guilt from an attempt to improperly influence or cause the absence of a material witness at trial." *Id.* We further found such threats constitute "admissions by conduct designed to obstruct justice" and were thus admissible to establish motive. *Id. citing* McCormick on Evidence 562 (E. Cleary ed.1984). Based upon this authority, we find the trial court did not abuse its discretion in admitting this evidence.

¶ 67 Next, Appellant claims the probative value of Kirkendoll's testimony regarding Appellant's threats was substantially outweighed by its prejudicial effect. *See* 12 O.S.1991, § 2403. We disagree. In the trial of Appellant's co-defendant, we recognized that "Oklahoma has long held that a defendant's attempt to influence witnesses not to testify or to testify falsely is relevant and may be admitted as an admission by conduct and considered on the issue of guilt." *Douglas v. State*, 1997 OK CR 79, ¶ 50, 951 P.2d 651, 668. This Court will not disturb a trial court's decision to admit evidence absent a clear abuse of discretion accompanied by prejudice. *Id.* 1997 OK CR 79, ¶ 55, 951 P.2d at 669. We find no clear abuse of discretion here.

¶ 68 Finally, Appellant claims the trial court committed reversible error by failing to give the jury the proper limiting instruction on the use of other crimes evidence. Despite the fact that such an instruction was never requested, he argues such an instruction is required under *Burks*. Of course *Burks* was overruled in part on this very issue. *See Jones*, 1989 OK CR 7, ¶ 7, 772 P.2d at 925. On the record before us, we find no plain error in the trial court's failure to issue such a limiting instruction *sua sponte*.

C.

¶ 69 In Proposition seven, Appellant claims the trial court improperly admitted testimonial evidence under the co-conspirator exception to the hearsay rule. He claims this error denied him a fair trial in violation of the Sixth and Fourteenth Amendments of the U.S. Constitution and Article II, §§ 7 and 20 of the Oklahoma Constitution. He claims the trial court admitted statements without first determining a conspiracy actually existed. He further claims that, even if a conspiracy had been shown, the evidence did not prove he was one of the conspirators because there was no evidence that he was present when the statements were made.

¶ 70 Appellant points to three or four statements admitted under this exception. E.R. testified that several hours before the attack on Smith and Farrow, she saw Yancey Douglas and two other members of the Hoover Crips enter Appellant's hatchback. Douglas said, "Are y'all ready to do this?" Douglas then fired a shot out the passenger side window of the car. W.M. testified how Douglas had mentioned getting "into it" with some south side gang members. He also threatened to shoot up W.M.'s house. A.L. testified that on the night before the shooting, she saw Douglas and others approaching in Appellant's hatchback. Douglas was holding a gun. Someone said, "there go them SEV niggers," but then Douglas said, "Them is Nut's sisters, put the guns up."

¶ 71 A statement which is offered against a party and made by his co-conspirator during the course and in furtherance of their conspiracy is admissible and is not hearsay. 12 O.S.1991, 2801(4)(b)(5). *See also Omalza v. State*, 1995 OK CR 80, ¶ 13, 911 P.2d 286, 295–96. A co-conspirator's statements satisfy the requirements of relia-

bility and are admissible as non-hearsay substantive evidence only where the trial court finds: [1] a conspiracy existed; [2] both the defendant and the alleged co-conspirator declarant were parties to the conspiracy; [3] the statements were made during the duration of the conspiracy; and [4] the statements furthered the goals of the conspiracy. *Id.* at 296. The conspiracy must be proven by a preponderance of evidence, and the trial court may consider the alleged hearsay statements in reaching its decision. *Id.* "In a conspiracy prosecution, the critical inquiry is whether the circumstances, acts, and conduct of the parties are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists." *State v. Davis,* 1991 OK CR 123, ¶ 10, 823 P.2d 367, 370 *quoting United States v. Kendall,* 766 F.2d 1426, 1431 (10th Cir.1985). The existence of a conspiracy need not be established by direct evidence, but proof of circumstances from which the existence of a conspiracy may be fairly inferred is sufficient. *Davis,* 823 P.2d at 370.

■■■■ ¶ 72 To constitute the crime of conspiracy in Oklahoma, "two essential elements are required: an agreement between two or more people to commit an unlawful act, and some overt act by one or more of the parties in furtherance of this agreement." *Jones v. State,* 1998 OK CR 36, ¶ 3, 965 P.2d 385, 386. Here, Derrick Smith testified how a car drove past Smith and Farrow, turned around, and then drove back. The car pulled up to Smith and Shauna and then stopped. After a pause of two or three seconds, the driver's door opened, and gunfire erupted from inside. This testimony provides sufficient circumstantial evidence of an agreement between two or more persons to commit an unlawful act and overt action in furtherance of that agreement.

¶ 73 The testimony from E.R. and W.M. regarding statements made by Douglas demonstrated this same conspiracy existed three to four hours before the actual shooting took place. The testimony from A.L. established the conspiracy likely existed on the night before the shooting. Additionally, all of Douglas's statements were made in further-

ance of the conspiracy as they tended to show Douglas and others, while armed and driving Appellant's car, were actively searching for members of the S.E.V. Crips and threatening them in the hours before the shooting took place and on the previous night.

¶ 74 Appellant asserts the evidence failed to prove he was a part of the conspiracy at the time these statements were made. However, the conspirators were driving in the car loaned to Appellant. E.R. and W.M. testified Douglas was in the park with other members of the 107 Hoovers, and Douglas entered Appellant's car with two black males. Smith identified Appellant as the driver and Douglas as the front seat passenger of the car at the time of the shooting. This was sufficient circumstantial evidence for jurors to infer Appellant's knowledge of and participation in the conspiracy to shoot members of the S.E.V. Crips.

■■■■ ¶ 75 Appellant also complains there was not an *in camera* hearing in which the trial court determined a conspiracy existed prior to the admission of these statements. While the trial court did not actually remove the jury from the courtroom or reconvene in chambers, the record reflects private discussions were held before the trial court at the bench in regard to this matter.[26] However, *Omalza* specifically requires the trial court to:

> conduct a *Harjo [v. State,* 797 P.2d 338 (Okl.Cr.1990)] hearing at which the State shall call each witness from whom it intends to elicit coconspirator statements. The State shall produce evidence from which the trial court can make a ruling on the duration and objectives of the conspiracy. The trial court should consider all the evidence presented to determine the duration and objectives of the conspiracy and not limit itself to events which occurred prior to the completion of the conspiracy's principal aim. At the conclusion of the hearing the trial court shall announce its ruling which shall include the parties to the conspiracy, the dates or events which establish the duration of the conspiracy

**26.** Tr. V at 1222–27; Tr. VI at 1279–87, 1319–21.

and its finding of which statements further the conspiracy and are therefore admissible under section 2801(4)(b)(5).

*Omalza,* 1995 OK CR 80, ¶ 13, 911 P.2d at 299. This procedure was not followed in the instant case. The hearsay objections were made at the bench in the course of the trial, and, after brief arguments, the trial court ruled prima facie evidence of a conspiracy had been previously shown. While these discussions were outside the presence of jurors, the witnesses were not called, and the trial court made no specific ruling regarding the parties to the conspiracy, the dates and events, and the particular statements in furtherance of the conspiracy which were admissible.

¶ 76 However, Appellant was not prejudiced by this omission because, as shown above, sufficient evidence was introduced that a conspiracy existed on the night before the murder and that Appellant participated therein. In addition, all of the testimony elicited fell within the *Harjo* and *Omalza* criteria as statements which furthered the conspiracy and which were within the duration and objectives thereof. Moreover, even if these statement did not qualify as non-hearsay co-conspirator statements, they were admissible through other means. Douglas's statements were reflective of his state of mind in the hours before the fatal shooting. *See* 12 O.S.1991, § 2803(3). His state of mind was relevant because Smith testified Douglas was one of three persons in the car from which the shots were fired. Furthermore, Douglas's statements to A.L. were present sense impressions which described an event while Douglas was perceiving it. *See* 12 O.S.1991, § 2803(1). These traditional exceptions to the hearsay rule do not violate Appellant's right of confrontation. *See Idaho v. Wright,* 497 U.S. 805, 814–15, 110 S.Ct. 3139, 3146–47, 111 L.Ed.2d 638 (1990); *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980); *California v. Green,* 399 U.S. 149, 158–64, 90 S.Ct. 1930, 1936–38, 26 L.Ed.2d 489 (1970). Therefore, any error used in the procedure is harmless under the facts of this case. This proposition is denied.

**D.**

¶ 77 In Proposition eight, Appellant claims evidentiary errors occurring in the first stage of trial denied him due process, a fundamentally fair trial, and a reliable sentencing proceeding under the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution and the corresponding provisions of the Oklahoma Constitution. He first complains the trial court abused its discretion by allowing the prosecutor to use leading questions in an improper manner during Derrick Smith's testimony. He cites five instances where defense counsel objected to the prosecutor's leading of Smith during direct examination.

¶ 78 It has long been a settled rule of law in Oklahoma that leading questions which suggest the answer to the witness should not be asked the witness by the party placing him upon the stand. *Green v. State,* 163 P.2d 554, 556, 81 Okl.Cr. 282 (Okl.Cr. 1945). However, the decision of whether to permit leading questions is largely a matter of discretion on the part of the trial judge. *Carol v. State,* 1988 OK CR 114, ¶ 6, 756 P.2d 614, 616; *Cooper v. State,* 1983 OK CR 154, ¶ 10, 671 P.2d 1168, 1173.

¶ 79 During direct examination, leading questions are permissible when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party. 12 O.S.1991, § 2611(D). Leading questions are also permissible "as may be necessary to the develop [the witness's] testimony." *Id.* This commonly happens in three circumstances. First, leading questions are often used to develop preliminary matters, i.e. the name, place of residence and occupation of the witness, or other matter similarly not in dispute. See 3 Whinery, Oklahoma Evidence, § 4611. "This saves time and has the added advantage of placing the witness at ease before the examination begins with respect to critical issues in the case." *Id.* Leading questions are also commonly used to develop the testimony of children or persons with limited understanding of the information sought. See *id.* Finally, leading questions are used to revive the recollections of a witness. *Id.*

¶ 80 Having reviewed the five instances where defense counsel objected on

the basis of leading questions, we find Appellant suffered no prejudice in regard thereto. In one instance, the prosecutor asked an improper leading question which the trial court overruled, but Smith did not respond with the suggested answer.[27] In three other instances, the questions asked arguably suggested the answer desired by the prosecutor, but Smith's answer was inconsequential.[28] In these instances, Smith's testimony was cumulative to other trial testimony or did not concern an issue critical to the case.

¶ 81 The final instance was when the prosecutor asked, "Have you ever heard hard shifting automatics before?" This was obviously asked in order to get Smith to say yes, thereby suggesting the car Smith had identified could have been an automatic rather than a standard shift. This was an improper leading question. However, Smith had already testified he did not know "for sure" whether the car was a stick shift or not. This question did not have a substantial influence on the outcome of the trial. *Simpson v. State,* 1994 OK CR 40, ¶ 37, 876 P.2d 690, 702.

¶ 82 Appellant next complains about the procedures used at trial for identifying Appellant's car. He claims there was an insufficient foundation laid for the admission of State's exhibit 2, a photograph of the alleged car loaned to Appellant by Leon Washington. Appellant further claims witness identifications were unreliable because witnesses were shown a picture of Appellant's car and asked if that was the car they had seen. He analogizes this procedure to the use of a one-person lineup for identifying an alleged perpetrator of a crime.

¶ 83 When State's exhibit 2 was admitted into evidence, Appellant did not object to its admission on the basis of a lack of foundation or otherwise. Therefore, he has waived this claim of error, absent plain error. See 12 O.S.1991, § 2104. We find no plain error. Leon Washington, the former owner of the car, identified the car as the one he formerly owned and loaned to Appellant. A police offi-

cer testified the tag number of the car recovered and the one owned by Washington were the same.

¶ 84 We further find no support in the law for Appellant's claim that the identifications of the car were inadmissible because Smith, E.R., W.M., A.L., and Lawrence Kirkendoll were not shown a photographic lineup of automobiles from which to choose prior to identifying the car. While Appellant's suggested procedure might have made the witness's identifications even more reliable, it was not a prerequisite for admission of the identifications. This is especially true here due to the sheer number of identifications and the admission of State's exhibit 2 into evidence without objection. Moreover, the evidence code specifically allows for this method of identification. See 12 O.S.1991, § 2901(B)(1) & (4).

¶ 85 Appellant next claims the trial court improperly allowed Lawrence Kirkendoll to testify that, at Yancey Douglas's trial, he had identified Douglas as the person he saw with Appellant after Smith and Farrow had been shot. Appellant points out the fact that Kirkendoll had been unable to identify Douglas during Douglas's trial until he was shown a photograph of Douglas as he appeared in June of 1993. Appellant claims this method of identification was unduly suggestive.

¶ 86 Appellant filed a pre-trial motion to quash this identification based upon its lack of reliability. During an in camera hearing on this motion, the trial court overruled Appellant's motion, stating:

I'm not ruling that the identification of Yancy Douglas is relevant as against Mr. Powell. Saying that the Court's already ruled on that. That's probably one of the issues on appeal. I don't know. But I'm going to allow that testimony. I'm going to overrule your motion to suppress their identification. We'll take up that situation as it may arise.[29]

¶ 87 When the issue arose at trial, Kirkendoll testified how Appellant appeared at his

---

27. Tr. V at 1083.

28. Tr. V at 1083–84, 1127, and 1131.

29. Tr. I at 5–6. Note the alternate spelling for Yancey Douglas used in Appellant's trial.

door on the night in question with "another gentleman."[30] The prosecutor then asked, "Do you know who that other gentleman is?" Kirkendoll testified, "I do now." At this point, Appellant's trial counsel said he objected "unless we lay some foundation. He does now, and he didn't then? I mean, did somebody tell him? Is this hearsay?" The trial court then ruled, "I think he can identify him if he knows and how he knows." We take this to mean the Court wanted Kirkendoll to explain how he came to know this person was Yancey Douglas.

¶ 88 At this point, the State offered to ask the question in another way. The following transpired without further objection:

Q. Have you had occasion to identify that person in another proceeding in court?

A. Yes.

Q. And who is that person?

A. Yancy Douglas.

Q. And were you in this courthouse, in this courtroom—

A. Yes.

Q. When you were in this courtroom, did he look the same that he did back when you saw him on June 25 of 1993?

A. No.

Q. What was different about him?

A. Short hair and he was dressed nice.[31]

¶ 89 During Kirkendoll's cross examination, Appellant's trial counsel was able to get Kirkendoll to admit he had been unable to identify Douglas in person during the trial. At that time, some two years after he had seen Douglas with Appellant, Kirkendoll knew the person sitting in the courtroom was the person he was supposed to identify. However, Kirkendoll could not identify Douglas, apparently because Douglas was dressed differently and had shorter hair. When he was unable to identify him, the prosecutor showed Kirkendoll a single photo of Douglas taken near the time of the crime. Kirkendoll identified Douglas from this single picture.

¶ 90 This is a rather unique set of facts. Under normal circumstances, a defendant claims the display of a single photograph is unduly suggestive when it is shown to a victim shortly after a crime. When the victim takes the stand and identifies the defendant in court, the defendant claims the in-court identification was tainted by the unduly suggestive pre-trial procedure. See e.g. Highsaw v. State, 1988 OK CR 128, ¶ 11–13, 758 P.2d 336, 339. Here, we have a witness who was unable to identify Appellant's co-defendant during the co-defendant's trial. When the witness was unable to make an in-court identification, the trial court allowed the witness to identify the co-defendant through a photograph which showed him as he looked on the night of the crime. The question is whether the trial court in Appellant's trial should have excluded this identification made in Douglas's trial as unreliable.

¶ 91 When addressing the admissibility of an eyewitnesses' in-court identification under suggestive circumstances, this Court has used the test set forth in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), i.e. "whether, under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Id. at 199, 93 S.Ct. at 382. Factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. Id.; see also Highsaw, 1988 OK CR 128, ¶ 13, 758 P.2d at 339. We will also consider all of the surrounding circumstances. Pennington v. State, 1995 OK CR 79, ¶ 33, 913 P.2d 1356, 1365.

¶ 92 Assuming arguendo that these same factors are relevant to the instant case, we would look to the totality of the circumstances in order to determine if Kirkendoll's identification of Douglas should have been excluded. Kirkendoll testified that Douglas was at Kirkendoll's home for about two to

---

30. Tr. VI at 1466.

31. Tr. VI at 1467.

ten minutes after the shooting.[32] During this time, Douglas and Appellant were both inside and outside of Kirkendoll's home. It was dark outside, but Kirkendoll was with Douglas and Appellant for only about fifteen seconds outside. Most of the time, Douglas and Appellant were standing inside the breezeway of Kirkendoll's home. Kirkendoll also testified that, prior to Douglas's trial, he was confident he would be able to identify Douglas. However, Kirkendoll was unable to identify him in person. He could only identify Douglas through the single photograph he was shown. Even then he could not say that Douglas was the man with absolute certainty.

¶ 93 At the time of his in court identification, Kirkendoll had not seen Douglas in two years. However, on the night of the homicide, Kirkendoll saw Appellant's car parked outside his home on the way to take Appellant to the hospital. Douglas left in that car with another person who was seated inside. Douglas returned that car to Washington at a later time.

¶ 94 From this testimony, it appears Kirkendoll had a fairly good opportunity to observe Douglas. We have no information regarding the accuracy of Kirkendoll's prior descriptions of Douglas or his degree of attention. From what we know, his level of certainty was good regarding the photograph, but not absolute. The time between the crime and the confrontation was lengthy. However, Kirkendoll also saw Appellant's car, and that car was connected to Douglas both before and after the homicide.

¶ 95 Considering the totality of the circumstances, we find Kirkendoll's identification of Douglas was reliable. Certainly the trial court did not abuse its discretion in allowing the admission of this evidence, considering the objection Appellant's counsel raised at trial. Moreover, the jury was fully informed regarding this issue. Appellant's attorney conducted effective cross-examination of Kirkendoll regarding his inability to previously identify Douglas in person. "The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." *Simmons v. U.S.*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

¶ 96 Next, Appellant claims the improper admission of hearsay testimony denied him due process and the right to confront his accusers. He cites six instances. He first complains about Derrick Smith testifying to what A.L. and J.L. had seen or heard at the Ambassador Court apartments on June 23, 1993. Smith testified the girls said "some guys had came to waive guns at them."[33] There is no hearsay here. A.L. testified at trial and was subject to cross-examination regarding this matter. The statement was offered for purposes of identifying Douglas. See 12 O.S.1991, § 2801(4)(a). This same logic applies to W.M.'s testimony regarding E.R.'s telephone call to 911.[34]

¶ 97 We have already determined A.L.'s testimony regarding statements made by Yancey Douglas was admissible. Appellant has added nothing new here, except to say A.L., W.M., and Officer Jackson testified regarding gang connections of numerous individuals, including Douglas. However, there were no "statements" made on this point, and so the hearsay rule does not apply. Furthermore, Officer Jackson's testimony about his communication with the homicide division concerning this case was not hearsay. His statements were not offered for the truth of the matter asserted. 12 O.S.1991, § 2801(3). They were offered to show why Officer Jackson began searching for Yancey Douglas. Moreover, Appellant did not object to this testimony on the basis of hearsay.

¶ 98 We also find Officer Kuhlman's testimony that "someone" told him Appellant was in Baptist Hospital was not hearsay. This testimony was offered to show why Officer Kuhlman went to Baptist Hospital, not to prove Appellant was there. Furthermore, Kuhlman never testified regarding a declarant's out of court statement regarding the

---

32. Tr. VI at 1469, 1501.

33. Tr. V at 1084.

34. Tr. VI at 1324.

time of Yancey Douglas's arrest. Kuhlman testified from his own personal knowledge regarding this matter.

■ ¶ 99 Next, Appellant complains about "highly prejudicial" testimony admitted during his trial. James Harding testified about bullets hitting his house as a result of the drive-by shooting. Although no one was home at Harding's house at the time, Appellant claims this evidence tended to evoke sympathy by showing someone would have been hurt if they had been home.

¶ 100 Harding testified he and his family would normally have been home at the time of the shooting, but were not that night. However, when he was asked where his family would normally congregate in the home, Appellant's trial counsel objected, and the trial court sustained the objection.[35]

¶ 101 The prosecutor was getting into an area which was not relevant to the issues at trial and was potentially prejudicial to Appellant. However, the trial court's ruling prevented any damage and cured any possible error. *Pennington v. State,* 1995 OK CR 79, ¶ 58, 913 P.2d 1356, 1369; *Pickens v. State,* 1993 OK CR 15, ¶ 52, 850 P.2d 328, 341.

■ ¶ 102 Finally, Appellant claims an evidentiary harpoon unfairly and erroneously informed the jury of other bad acts by Appellant. While Appellant was in Baptist Hospital with a gunshot wound to his hand, he used the name Marty Powell. Officer Kuhlman testified, "I believe it was an alias on his BR that he had used in the past. . . ."[36]

¶ 103 This was not an evidentiary harpoon. The prosecutor was trying to establish if Appellant commonly used the name Marty Powell or whether he was trying to hide his identity. Officer Kuhlman's statement was responsive to a legitimate question. There is no indication it was "wilfully jabbed" in order to prejudice Appellant. *See Bruner v. State,* 1980 OK CR 52, ¶ 17, 612 P.2d 1375, 1378. The statement did not obviously inject evidence of other crimes in its reference to a "BR." Furthermore, the trial court sustained Appellant's objection on this point and admonished the jury to disregard the answer.

This cured any possible error. *Al–Mosawi,* 1996 OK CR 59, ¶ 60, 929 P.2d at 284.

### E.

¶ 104 In his tenth proposition of error, Appellant claims the trial court committed reversible error by failing to instruct the jury on second degree felony murder and first degree manslaughter as lesser included offenses, thus violating Appellant's right under the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution.

■ ¶ 105 Concerning the absence of a second degree felony murder instruction, Appellant asserts the evidence does not show he acted with an intent to kill. Instead, Appellant claims "the information and evidence, if believed, support the theory that Mr. Powell participated in the crime of using an automobile to facilitate the discharge of a firearm which resulted in the death of Shauna Farrow." However, this is a gross understatement of the evidence presented at Appellant's trial. The evidence reflects Appellant, Douglas, and a third person fired fifteen to sixteen shots from three separate guns toward Smith and Farrow from a relatively short distance.

¶ 106 In *Shrum v. State,* 1999 OK CR 41, 991 P.2d 1032, this Court adopted the evidence test for reviewing alleged errors relating to the giving or failure to give lesser-included offense instructions in a homicide case. Under *Shrum,* "all lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be administered if they are supported by the evidence." *Shrum,* 1999 OK CR 41, ¶ 10, 991 P.2d at 1036. Here, the evidence does not support the giving of a second degree felony murder instruction. Most certainly, the trial court did not abuse its discretion in failing to give this instruction.

■ ¶ 107 Similarly, an instruction on first degree manslaughter was not required. A homicide is heat of passion first degree manslaughter "[w]hen perpetrated without a design to effect death, and in a heat of

---

**35.** Tr. V at 1213–14.

**36.** Tr. VI at 1413.

passion, but in a cruel and unusual manner, or by means of a dangerous weapon...." *Lewis v. State*, 1998 OK CR 24, ¶ 16, 970 P.2d 1158, 1166, *quoting* 21 O.S.1991, § 711(2). "The elements of heat of passion are: 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection between the provocation, passion and homicide." *Charm v. State*, 1996 OK CR 40, 924 P.2d 754, 760, *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997). Further, to support an instruction on misdemeanor-manslaughter under 21 O.S.1991, § 711(1), the evidence must show that the homicide was perpetrated without a design to effect death and by one engaged in the commission of a misdemeanor. *Revilla v. State*, 1994 OK CR 24, ¶ 18, 877 P.2d 1143, 1150.

¶ 108 The evidence does not reflect Shauna Farrow's death was perpetrated during the commission of a misdemeanor, without a design to effect death, or in a heat of passion, as defined. Therefore, the trial court did not abuse its discretion in failing to give first degree manslaughter instructions.

### F.

¶ 109 In Proposition eleven, Appellant's Brief in Chief claimed the first stage verdict form failed to submit the issue of sentencing on the charge of shooting with intent to kill to the jury. However, Appellant withdrew this proposition in his Reply Brief.

### G.

¶ 110 In Proposition twelve, Appellant claims the uniform jury instructions given to his jury do not correctly state the law on aiding and abetting. He claims the instructions were misleading because they confused the specific premeditated intent to kill required of malice aforethought murder with the general criminal intent described in the aiding and abetting instructions. He did not, however, raise this objection at trial.

¶ 111 We have addressed this issue numerous times in the past and rejected it. *See e.g.*

*Torres v. State*, 1998 OK CR 40, ¶ 41, 962 P.2d 3, 16; *Conover*, 1997 OK CR 6, ¶ 40–47, 933 P.2d at 914–16; *Johnson v. State*, 1996 OK CR 36, ¶ 22–24, 928 P.2d 309, 315–16; and *Cannon v. State*, 1995 OK CR 45, ¶ 18–20, 904 P.2d 89, 99. Indeed, this very argument was rejected in Appellant's co-defendant's appeal. *Douglas*, 1997 OK CR 79, ¶ 64, 951 P.2d at 671. We reject it again here.

### *SENTENCING STAGE ISSUES*

### A.

¶ 112 In his thirteenth proposition of error, Appellant claims the jury's finding that Appellant knowingly created a great risk of death to more than one person was based upon improper argument, thereby making his death sentence unreliable under the Eighth and Fourteenth Amendments of the U.S. Constitution. He points out that the prosecutor argued during second stage closing arguments that a risk existed to hypothetical bystanders and to people who might have been inside one of the houses in which a bullet entered.

¶ 113 As Appellant accurately states, we previously found this practice to be error in Yancey Douglas's trial. *Douglas*, 1997 OK CR 79, ¶ 96, 951 P.2d at 677. Given the fact that Appellant was tried before the Douglas opinion was decided and the presence of the same prosecutor in both trials, it is not surprising that the same error occurred here.

¶ 114 We wish to reemphasize our holding in *Douglas*. When considering the aggravating circumstance that a defendant knowingly created a great risk of death to more than one person, a defendant cannot be condemned for what might have occurred, but can only be condemned when his conduct caused a great risk to actual bystanders. "There must be actual risk to bystanders rather than possible risk." *Id.* Accordingly, as in *Douglas*, the prosecutor's remarks were error.

¶ 115 However, the evidence clearly reflects Appellant knowingly created a great risk of death to both Smith and Farrow without considering hypothetical bystanders or would-be occupants of homes. Therefore,

as in *Douglas,* we find this error to be harmless. 12 O.S.1991, § 2104(A); *see also Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Simpson,* 1994 OK CR 40, ¶ 37, 876 P.2d at 702.

### B.

¶ 116 In his fourteenth proposition of error, Appellant claims his death sentence must be vacated because the use of victim impact evidence violated his rights under the Eighth and Fourteenth Amendments of the U.S. Constitution and Article 2, §§ 7 and 9 of the Oklahoma Constitution. He begins by claiming some of the victim impact evidence exceeded the restrictions this Court placed on the use of victim impact evidence in *Cargle v. State,* 1995 OK CR 77, ¶ 75, 909 P.2d 806, 828, *cert. denied,* 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996).

¶ 117 The State presented the victim's mother and grandmother to testify in the second stage regarding the impact Shauna Farrow's death had on their lives. Their testimony was relatively short and was consistent with the "quick glimpse" of Ms. Farrow's life, as set forth in *Cargle. Id.*

¶ 118 Appellant claims the testimony of the victim impact witnesses was cumulative. He claims both witnesses testified how the victim was missed at holidays. However, we find the testimony was not cumulative simply because it briefly overlapped on one or two factual points.

¶ 119 Appellant complains about hearsay introduced by these witnesses, but he did not object on this basis at trial. Moreover, the statements, relating to a four year old child wondering where Shauna is, were not offered for the truth of the matter asserted. They were offered to show the emotional and psychological impact of Shauna's death on her family members. *See Patton v. State,* 1998 OK CR 66, ¶ 79, 973 P.2d 270, 294(statement offered to show son's concern for his father, the victim). We find no error.

¶ 120 Appellant further complains Pat Farrow was improperly allowed to testify

that she was in the hospital giving birth to her son on the night her daughter Shauna was killed. We agree this statement was not particularly relevant, but we disagree that it had any prejudicial impact on the trial or impacted Appellant's constitutional rights. Indeed, the fact that Mrs. Farrow had another child besides Shauna arguably lessened the devastating impact of her loss to a minor degree. We find no error.

¶ 121 Appellant next complains fundamental error occurred when the trial court failed to administer the jury instruction this Court set forth in *Cargle.*[37] However, while the *Cargle* instruction is directed to be given, the failure to give the instruction is not automatically fatal. This instruction is useful to assist juries in using victim impact evidence. *Id.* This is especially true when the victim impact testimony is borderline or tends to cross over the line of what can be considered permissible. That is not true here.

¶ 122 In *Thornburg v. State,* 1999 OK CR 32, ¶ 34, 985 P.2d 1234, a similar argument was raised. As in *Thornburg,* Appellant did not request an instruction on victim impact evidence and did not complain that the trial judge did not administer one. As in *Thornburg,* Appellant has failed to demonstrate how the lack of an instruction has harmed him, how the jury's sentencing discretion was improperly channeled, or how the jury was influenced by the victim impact evidence to impose a sentence not supported by the evidence. *See Darks v. State,* 1998 OK CR 15, ¶ 48, 954 P.2d 152, 165. This argument warrants no relief.

¶ 123 Appellant's counsel was not ineffective for failing to request this instruction. While the instruction may have been helpful to Appellant, trial counsel's failure to request the *Cargle* instruction was not so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

### C.

¶ 124 In his fifteenth proposition of error, Appellant claims his death sentence is

---

**37.**   1995 OK CR 77, ¶ 77, 909 P.2d at 828–29.

grossly unfair and unreliable under both the State and Federal Constitutions because his jury was allowed to sentence him to death without having to determine Appellant's actual culpability in relation to the charge of first degree malice aforethought murder. He cites *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) in support of this argument, claiming there has been no finding Appellant ever possessed the specific intent to kill.

¶ 125 However, Appellant concedes we have held otherwise, including our decision in the appeal of Appellant's co-defendant, Yancey Douglas. Because this was a malice murder case and the jury found Appellant acted with malice aforethought, an *Enmund* instruction was not warranted. *Douglas v. State*, 1997 OK CR 79, ¶ 64, 951 P.2d 651, 671. *Enmund* was a felony murder case, not a first degree malice aforethought murder case. Unlike felony murder, the absence of a finding of intent in malice aforethought murder will defeat a conviction at the guilt stage in Oklahoma. *Mann v. State*, 1988 OK CR 7, 749 P.2d 1151, 1161, *cert. denied*, 488 U.S. 877, 109 S.Ct. 193, 102 L.Ed.2d 163 (1988). Likewise, this proposition is without merit as to Appellant.

### D.

¶ 126 In Proposition sixteen, Appellant claims reversible error occurred when the trial court failed to answer the jury's questions about the meaning of the sentences of life and life without parole. He asserts that the trial court improperly refused his request for a jury instruction consistent with the instruction approved in *Johnson v. State*, 1996 OK CR 36, ¶ 52, 928 P.2d 309, 320. He claims this violated his federal and state due process rights.

¶ 127 This proposition is without merit. This precise issue was presented in *Patton v. State*, 1998 OK CR 66, ¶ 101, 973 P.2d 270, 298. There, we cited to *Mayes v. State*, 1994 OK CR 44, 887 P.2d 1288, 1316–18, in stating:

> This Court has held there is no requirement for a trial judge to explain the Oklahoma parole process to a jury. *Mayes*,

887 P.2d at 1318. "[T]he concept of parole is sufficiently clear to enable any rational juror to understand it without explaining it further." *Id.* In *Johnson*, we stated that the plain language of the jury instruction setting forth the possible punishment options may be modified to provide greater clarity. 928 P.2d at 320. However, we specifically held such a modification in the instruction was not required. Here, the jury was adequately instructed as to the punishment of life without the possibility of parole.

### ISSUES AFFECTING BOTH STAGES OF TRIAL

#### A.

¶ 128 In his ninth proposition of error, Appellant claims prosecutorial misconduct, occurring during both stages of his trial, deprived him of his due process rights to a fair trial and reliable sentencing proceeding in violation of the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution. He claims this alleged misconduct entitles him to a new trial or sentence modification. Appellant cites to twelve separate categories of alleged misconduct, with each category containing one or more representative instances.

¶ 129 Appellant first complains about three arguments made by the State which were "wholly unsupported by evidence." However, we find each to be fairly supported by the record. Several witnesses testified regarding the State's theory that this was a gang-related murder. The State's argument that Appellant was present at Pitts Park is supported by the presence of the car he obtained from Leon Washington. The State's "friendly fire" argument is a permissible inference from the medical testimony presented.

¶ 130 Next, Appellant claims the prosecutor "shamelessly invoked societal alarm" during the trial. He cites five instances: one during first stage opening arguments; three during first stage closing arguments; and one during second stage closing arguments. Of these five, Appellant raised a contemporaneous objection on the basis claimed here two times, and both objections were over-

ruled. For the remaining three, we will review for plain error. *Simpson,* 1994 OK CR 40, ¶ 37, 876 P.2d at 702.

■ ¶ 131 Regarding the three instances to which no contemporaneous objection was made, we find no plain error. We have already dealt with the comments relating to a "classic gang murder" and hypothetical bystanders.[38] The prosecutors final comment during second stage closing was objectionable but does not leave us in grave doubts about the verdict.[39]

■ ¶ 132 Concerning the other two instances, the first did not clearly invoke societal alarm. The prosecutor merely pointed out that gang cases generate fear among the witnesses. The second argument was more dubious. Here, the prosecutor argued that witnesses had placed their trust in the "system," not the street. This tied in with the fear theme he had raised earlier. The prosecutor then argued "whatever failure our system has is magnified upon the shoulders of those people that have to live amongst the Paris Powells. Who can blame them for being uneasy, unconfident, unwilling? But justice right here will promote confidence."

¶ 133 This argument is borderline. It suggests witnesses will be unwilling to testify in such cases unless the jury provides "justice." However, at other times, these comments seem to be directed at Appellant rather than society as a whole.[40] We find Appellant's objection should have been sustained. However, we find the error was harmless.

■ ¶ 134 The third alleged area of prosecutorial misconduct concerns the prosecutor supposedly impugning the integrity of defense counsel. He cites five instances. Having reviewed each, we find each instance was more in the nature of an attack on the evidence rather than on defense counsel. Although one instance was objectionable, we do not find the prosecutor's "central theme" was one of attacking defense counsel.[41]

■ ¶ 135 Next, Appellant claims the prosecutor asked improper burden shifting questions. No objections were made to any of the comments. Appellant provides no real analysis of the precise statements to which he is referring. Having referred to the pages he has cited, no error is apparent to this Court. The issue is thus waived.

■ ¶ 136 Next, Appellant claims the prosecutor improperly vouched for Derrick Smith's testimony and the reliability of the State's evidence. He cites no authority to support his claim of error, and the issue is thus waived. Rule 3.5(A)(5), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (1998).

¶ 137 The sixth area of alleged prosecutorial misconduct has been previously addressed in other areas of this opinion. The seventh area concerns the prosecutor supposedly telling the jury the death penalty was the appropriate penalty for this case and expressing his own sense of "justice." However, Appellant did not raise this objection at trial, and we find the prosecutor's statements do not go so far as Appellant suggests.

■ ¶ 138 Next, Appellant claims the prosecutor improperly denigrated the evidence presented in mitigation by telling the jury the mitigating factors were not mitigating at all. He claims the prosecutor essentially told the jury to disregard the trial court's instructions. Again, Appellant does not analyze this issue. He simply cites to eleven pages from the transcript and two United States Supreme Court cases, without page references.

¶ 139 The record reflects the prosecutor's comments were prefaced by the following: "The instructions clearly say you decide what is mitigating. You decide. Not because it's written down in some piece of paper that it

38. Tr. V at 1040; Tr. VII at 1552.

39. The prosecutor argued, "I simply suggest to you to protect society from him."

40. The prosecutor also argued, "we have the opportunity right now to demonstrate to Paris Powell that we will not tolerate any of the things

that you've heard in this courtroom." Tr. VII. at 1634. He then stated, "With your verdict, you can tell Paris Powell that we will not tolerate this." Tr. VII at 1637.

41. The prosecutor called defense counsel's legal argument "reprehensible."

may be. You decide."[42] The prosecutor then explained how the instructions defined mitigating evidence as evidence that, in fairness and mercy, reduces blame. Thereafter, the prosecutor made legal arguments as to why the mitigating circumstances listed in the jury instructions should not be considered as reducing blame. Clearly, the sentencer was not precluded from considering, as a mitigating factor, any aspect of a defendant's character or record or any of the circumstances of the offense which Appellant proffered as a basis for a sentence less than death. *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982); *see also* O.R. 556–58.

¶ 140 Appellant's ninth category of alleged prosecutorial misconduct concerns the prosecutor diminishing the jury's sense of responsibility in imposing the death sentence under *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). He cites two instances.

¶ 141 During second stage closing arguments, the prosecutor told the jurors, "You don't decide to execute the judgment. You only decide if he deserves it. That's it." Defense counsel objected to these arguments under *Caldwell,* and his objection was overruled.

¶ 142 In *Caldwell,* the U.S. Supreme Court held "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. at 2639. However, the *Caldwell* jurors had been told their decision was not the final decision because it was "automatically reviewable by the Supreme Court." *Caldwell,* 472 U.S. at 325–26, 105 S.Ct. at 2637–38.

¶ 143 At first glance, the prosecutor's argument appears to come dangerously close to violating *Caldwell.* However, the prosecutor argued that his argument was responsive to

questions asked by defense counsel during *voir dire.* For example, Appellant's trial counsel asked potential jurors whether they had ever stated, "I could pull the switch myself, I could stick a needle in his arm myself, I could carry out the death sentence myself."[43]

¶ 144 We see a fundamental difference between the statement in *Caldwell* and the statement made in Appellant's trial. The *Caldwell* jury was essentially told it did not matter what they decided, a higher court would make the final decision. In Appellant's trial, the prosecutor pointed out that, while the jury was responsible for deciding whether Appellant deserved the death penalty, they would not be participants in the act of carrying it out, i.e. executing judgment. We find this argument, while questionable, did not violate *Caldwell.* *See Pickens v. State,* 1993 OK CR 15, ¶ 63, 850 P.2d 328, 343. We also find the prosecutor's compliments to defense counsel did not violate *Caldwell.*[44]

¶ 145 The tenth category of alleged prosecutorial misconduct concerns the prosecutor commenting on Appellant's lack of remorse. However, this Court has held lack of remorse is a proper subject for comment during closing argument of second stage. *Woodruff v. State,* 1993 OK CR 7, ¶ 70, 846 P.2d 1124, 1141. This is especially true considering the prosecution also alleged the continuing threat aggravator. *See Douglas,* 1997 OK CR 79, ¶ 93, 951 P.2d at 676 (find lack of remorse is commonly used to prove the continuing threat aggravator).

¶ 146 Next, Appellant claims the prosecutor improperly used biblical references to bolster his argument about accountability. He points out that we have condemned arguments which imply God is on the side of the death sentence. *See Long v. State,* 1994 OK CR 60, ¶ 48, 883 P.2d 167, 177.

¶ 147 Here, the prosecutor's arguments did not imply God is on the side of the death

---

**42.** Tr. IX. at 2003.

**43.** Tr. II. at 287.

**44.** The prosecutor stated, "He had a full defense, very good lawyers. Everything that should have been presented to you was presented to you. No stone was left unturned in four years. . . ." Tr. IX. at 2017–18.

sentence. The first comment pointed out it is the jury's responsibility to judge this incident.[45] The second comment is more questionable. The prosecutor stated, "Some of you indicated that you were students of the Bible. And there's no question that in Romans, man shall submit to the government's laws, period. In the New Testament." However, this statement does not tell jurors that God is a proponent of the death penalty.

¶ 148 Still, this Court has said closing argument during a criminal trial should not include biblical references. *Fontenot v. State*, 1994 OK CR 42, ¶ 59, 881 P.2d 69, 85. It was error for the prosecutor to make this argument. However, these comments did not deprive Appellant of a fair trial. They did not encourage the jury to follow biblical standards rather than the Court's instructions.

¶ 149 Finally, Appellant claims the prosecutor repeated a practice we condemned in *Duckett v. State*, 1995 OK CR 61, ¶ 46, 919 P.2d 7, 19. The prosecutor, one of the same prosecutors who appeared in the *Duckett* case, argued improperly, "Is there any rightness to her, where she's at, in the grave, allowing him to live in the sun, receive his meals every day, lay on clean sheets every night, think about ways to manipulate the system until his next visit or letter. Is that right."

¶ 150 As we stated in *Duckett*, "these kinds of comments cannot be condoned. There is no reason for them and counsel knows better and does not need to go so far in the future." *Id.* Apparently, this warning has been ignored. While Appellant did not object to this comment, it is error. We shall consider it in assessing the cumulative effect of the allegations of prosecutorial misconduct.

¶ 151 Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such as to deprive the defendant of a fair trial. *Patton v. State*, 1998 OK CR 66, ¶ 126, 973 P.2d 270, 302. Here, we have found one unobjected-to instance where the prosecutor invoked societal alarm, and another borderline instance to which an objection was lodged. The prosecutor referred to defense counsel's legal argument as "reprehensible" on one occasion. The prosecutor also argued improperly from the Bible during closing arguments, but neither argument implied God was on the side of the death penalty. Finally, the prosecutor repeated an error we directly criticized in *Duckett*, albeit without objection from the defense.

¶ 152 No criminal trial is perfect. In *Romano v. State*, 1993 OK CR 8, ¶ 41, 847 P.2d 368, 380, we recognized, as did the United States Supreme Court in *United States v. Young*, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1, 9 (1985), that "in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be prejudicial to the accused." However, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.*

¶ 153 Viewing these instances in context, we cannot say they affected the overall fairness of Appellant's trial. Relief is not warranted.

### B.

¶ 154 In Proposition seventeen, Appellant claims he was denied his Constitutional right to effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution. He breaks this proposition down to two categories. First, he claims there was a breakdown in communication between he and his original trial counsel, Mr. Martin Ozinga. Second, he claims Mr. Ozinga failed to interview potential witnesses who were present at the crime

---

45. The prosecutor argued, "They say you are playing God of sorts. I suggest to you not to confuse by their words that in fact God will judge this man at the right time, when it's his time, but here on this earth you are responsible to judge just this incident, not him, but what he did, his conduct. Both the Old and New Testament that we've heard about in the voir dire account for that." Tr. IX at 1995.

scene and failed to investigate crime scene evidence.

¶ 155 In his first category of alleged ineffective assistance of counsel, Appellant claims the "breakdown in communication" between him and Mr. Ozinga resulted in a violation of his right to a speedy trial. He claims he had virtually no contact with Mr. Ozinga and that Mr. Ozinga ignored Appellant's pleas for a speedy trial. He further alleges Mr. Ozinga conducted very little, if any, investigation into Appellant's case, thereby resulting in the loss of an alibi witnesses, Fasha Norman, who supposedly died in Texas in December of 1993.

¶ 156 To support these allegations, Appellant has filed a motion for evidentiary hearing pursuant to Rule 3.11, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (1998). He has attached four affidavits as exhibits to that motion, including two hand-written affidavits he wrote in September, 1996 and June, 1997.

¶ 157 Appellant was arrested on suspicion of first degree murder in late June or early July, 1993. His trial was held four years later in May of 1997. Under this proposition, the delay does raise the issue of trial counsel's effectiveness in the pre-trial stages and if any ineffectiveness caused a denial of speedy trial.

¶ 158 In his affidavits, Appellant claims he told Mr. Ozinga he wanted a fast and speedy trial during their first meeting in July of 1993. However, Mr. Ozinga said they would need to get past the preliminary hearing first. The preliminary hearing was held in August and November of 1993. The transcripts of those proceedings are not included in the record in this appeal. Therefore, we cannot say why the proceedings were delayed for three months.

¶ 159 After Appellant was bound over for trial in November of 1993, a pre-trial conference was set for January 19, 1994. On that date, the matter was continued to March 1, 1994. The record is silent regarding the reason for this continuance, except for a bare notation on the docket sheet: "BLACK; BOTH DEFS MOT AND PTC CONT 3–1–94, 9 AM". This is a consistent problem throughout this record, as the docket sheet reflects approximately seventeen continuances were granted before Appellant's trial. We have very little information regarding why or by whom those continuances were sought beyond some inconclusive notations of the docket sheet.[46] Appellant's brief contends Mr. Ozinga sought several of the continuances and failed to consult with or notify Appellant they were being sought. The State also claims all but one or two of the continuances were the result of Mr. Ozinga's motions.[47] However, beyond Appellant's bare allegations, made on the eve of trial, there is really no evidence to show they were made without Appellant's knowledge or assent.

¶ 160 Throughout the remainder of 1994, Appellant's case had little activity beyond the granting of continuances and a motion for discovery filed on Appellant's behalf in August. In May of 1995, Mr. Ozinga sought and received a severance on Appellant's behalf. Yancey Douglas was tried in June of 1995. The record indicates Mr. Ozinga sought transcripts from that hearing in order to prepare for Appellant's trial.[48] This is a reasonable trial strategy, considering the fact that Douglas was given the death penalty.

¶ 161 During 1996, Appellant's case was basically dormant, except for continuances which were granted throughout the year. Mr. Ozinga also sought Appellant's preliminary hearing transcripts in December, 1996. The record indicates Ozinga sought these transcripts in order to allow Appellant to read them, hoping this might facilitate plea negotiations. According to Appellant, Mr. Ozinga retired from the Public Defender's office near the beginning of 1997, and his new trial counsel were appointed shortly thereafter.

---

**46.** Some docket sheet entries tend to show Mr. Ozinga approved a continuance. For example, a March 29, 1994 entry states: "BLACK: DEFS A & B CONT PTC AND MOTIONS 3–28–94, 1:30 PM." We do not know who sought the continuance, assented to it, or appeared at the hearing.

**47.** Tr. I at 35.

**48.** Tr. I at 35.

¶ 162 Appellant did not make any request for a speedy trial until the first day of his trial, i.e. May 5, 1997. At that time, Appellant's hand-written motion to quash was presented to the judge. It was filed two days later.

¶ 163 Assuming Mr. Ozinga did seek the majority of the continuances which led to the lengthy delay, Appellant has not shown how he was prejudiced by that delay. The alleged death of Fasha Norman appears to be unrelated to the lengthy delay. According to the bare allegation in Appellant's brief, Norman supposedly died within six months of Appellant's arrest. There does not appear to have been any "breakdown in communication" up to this point, as Appellant's preliminary hearing was held prior to this time. Furthermore, Appellant was well-represented by Robert Mildfelt and Michael McBride, his newly appointed counsel, at trial, despite the fact Appellant admittedly refused to communicate with them. Appellant has failed to show his counsels' representation fell below that expected of a reasonable, competent, and skillful defense attorney or that he was prejudiced thereby. *See Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

■ ¶ 164 Appellant next claims his subsequent trial attorneys were ineffective for failing to adequately investigate Linda and Gerald Greer and for failing to seek admission of Derrick Smith's jeans into evidence at trial. He attaches affidavits from the Greers to his motion for evidentiary hearing. Neither affidavit is particularly inconsistent with Derrick Smith's testimony. Appellant claims Mr. Greer was the person who helped Smith move back towards the house. However, Smith testified he did not know who dragged him three to four feet before leaving when the car returned. Mrs. Greer's affidavit indicates her husband changed clothes before going outside, and Mr. Greer's affidavit does not indicate seeing the car at all. It is possible Mr. Greer came outside after another person had already fled. The information in these affidavits and counsels' failure to seek admission of Smith's jeans do not dem-

onstrate ineffective assistance of counsel under *Strickland* or *Lockhart*.

■ ¶ 165 We also deny Appellant's motion for evidentiary hearing. Appellant has failed to make a threshold showing such hearing is warranted. Rule 3.11 requires Appellant, "in order to rebut the strong presumptions of regularity of trial proceedings and competency of trial counsel, ... to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence."

¶ 166 That has not been done here. Appellant complains about the denial of his right to a speedy trial through continuances Mr. Ozinga sought, but he has provided no evidence about the circumstances of these continuances. He claims he had virtually no contact with Mr. Ozinga, but his affidavit admits nine or ten meetings. Appellant filed a bar complaint against Mr. Ozinga but does not tell us how that complaint was resolved. The Greers' affidavits demonstrate they may have known some additional facts which might have been helpful, but these are only possibilities. These and other unsupported allegations in the motion, do not entitle Appellant to an evidentiary hearing.

### C.

¶ 167 In Proposition eighteen, Appellant claims trial errors and prosecutorial misconduct, when considered cumulatively, denied him state and federal due process and thus requires his sentence to be reversed or modified. We have already considered the cumulative effect of prosecutorial misconduct. We do not find any trial errors in this case which, when added to the incidents of prosecutorial misconduct, resulted in the denial of due process.

### D.

¶ 168 In Proposition nineteen, Appellant raises issues previously resolved by this Court in order to preserve his rights in subsequent proceedings.[49] We decline to reconsider our position on these issues.

---

**49.** Appellant claims: the sentencing-phase jury

instructions seriously diminished the effect of

### MANDATORY SENTENCE REVIEW

¶ 169 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. Turning to the second portion of this mandate, the jury found the existence of one aggravating circumstance: Appellant knowingly created a great risk of death to more than one person. 21 O.S.1991, § 701.12(2). As discussed previously, we have found the evidence was sufficient to demonstrate Appellate knowingly created a great risk of death to more than one person.

¶ 170 Mitigating evidence was presented by Appellant in the form of witnesses who collectively testified to the following: Appellant's age at the time of the incident was nineteen; Appellant has an emotional family history; Appellant has attempted to dissuade others from gang or criminal activity; Appellant has friends and family that love him and his life is significant to them; Appellant is a man of average intelligence; and Appellant is capable of making a contribution to himself and society while in a prison environment. The jury was also allowed to consider: any residual doubt it may have as to Appellant's guilt; the possibility that someone else was the leader and instigator of this incident; the possibility that Appellant may not have discharged the fatal shot; and any other mitigating circumstances they might find.

¶ 171 Upon review of the record and after carefully weighing the aggravating circumstance and the mitigating evidence, along with the errors alleged in this appeal, we find the sentence of death to be factually substantiated and appropriate. We cannot say the sentence of death is being imposed under the influence of passion, prejudice, or any other arbitrary factor.

### DECISION

¶ 172 The judgment and sentence are hereby **AFFIRMED.**

JOHNSON, J., and LILE, J., concur.

STRUBHAR, P.J., concurs in results.

CHAPEL, J., dissents.

CHAPEL, Judge, Dissenting:

¶ 1 I would affirm neither the conviction nor the death sentence in this case. Four separate problems in first and second stages require reversal. First, Powell should have received an instruction on second degree felony murder. We recently determined that the jury should be instructed on all lesser forms of homicide supported by the evidence.[1] Powell drove a car used in a drive-by shooting. Although the majority dismisses this proposition by claiming Powell, Douglas and a third person shot at the victims, the record does not clearly show Powell did anything more than drive, and he was tried on an aiding and abetting theory. Some evidence supports Powell's claim that he neither shot anyone nor intended to kill. Under these circumstances, the jury should have been instructed on second degree felony murder. For this reason, I would not affirm Powell's conviction for first degree murder.

¶ 2 In second stage, I cannot overlook the prosecutor's attempts to inflame the jury and diminish the jury's sense of responsibility in imposing the death sentence. As the majority notes, this same prosecutor was previously admonished not to argue that the victim was dead while the defendant slept on clean sheets and ate daily meals; this Court re-

---

mitigating evidence; the trial court erred by failing to instruct jurors they could consider a sentence of life or life without parole even after finding an aggravating circumstance; OUJI–CR 2d 4–80 (1996) permitted the jury to weigh the totality of aggravating circumstances against each individual mitigating circumstance, rather than weighing the aggregate mitigating factors found against each separate aggravating circumstance; Oklahoma's death penalty scheme is un-

constitutional; Oklahoma's death penalty procedure improperly requires a jury to make special findings of fact; Appellant was not given an instruction on the presumption of a life sentence; Appellant has a right to allocution and to argue last; and Appellant was entitled to a separate jury to decide punishment.

1. *Shrum v. State*, 1999 OK CR 41, 991 P.2d 1032.

fused to condone this argument.[2] The majority admits the prosecutor apparently chose to ignore this Court's explicit warning not to repeat the mistake, but once again fails to attach any consequence to the prosecutor's decision. I believe we should no longer let this error pass. In addition, the prosecutor told the jury it didn't decide to execute the judgment, only whether Powell deserved death. I agree with the majority that this comes "dangerously close" to violating Caldwell v. Mississippi.[3] In fact, it does violate that case's prohibition against telling the jury that they are not responsible for determining the appropriateness of a death sentence. I see no significant difference between telling a jury an appellate court will make the final decision and telling them someone else will decide to actually kill the defendant once the jury so recommends.

¶ 3 Once again the majority chooses to disregard the issues raised by the jury's explicit question regarding the meaning of life without the possibility of parole. I have consistently stated that the jury should be informed of the meaning of life without parole.[4] Our error in failing to require this instruction has, in my judgment, resulted in death sentences for many who would otherwise have received the life without parole sentence.

¶ 4 Finally, I am disturbed by the implications of Powell's death sentence. Powell was tried as an aider and abettor, and the State did not explicitly argue that he personally shot or killed either victim. Before Powell can be eligible for the death penalty, I believe there must be some finding either that he had the specific intent to kill or exhibited reckless disregard or indifference to the value of human life.[5] The majority's facile discussion of this issue focuses on the fact that this was a prosecution for malice murder without mentioning that, as an aider and abettor, Powell himself was not required to share the "malice," or specific intent to kill, that might otherwise remove the need for a finding of personal culpability. The jury was only asked to find Powell aided and abetted someone who shot the victim with malice aforethought, not that Powell himself intended to kill. Under these circumstances I believe the jury should have been instructed to determine Powell's level of personal culpability before it could find him eligible to receive the death penalty.

2. *Duckett v. State*, 1995 OK CR 61, 919 P.2d 7, 19, *cert. denied*, 519 U.S. 1131, 117 S.Ct. 991, 136 L.Ed.2d 872 (1997).

3. 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

4. *See, e.g., Ochoa v. State*, 1998 OK CR 41, 963 P.2d 583, 605 n. 100. *cert. denied*, 526 U.S. 1023, 119 S.Ct. 1263, 143 L.Ed.2d 358 (1999); *Mollett v. State*, 1997 OK CR 28, 939 P.2d 1, 15, *cert. denied*, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998) (Chapel, J., concurring in result); *Johnson v. State*, 1996 OK CR 36, 928 P.2d 309, 321 (Chapel, J., specially concurring);

*Smallwood v. State*, 1995 OK CR 60, 907 P.2d 217, 239, *cert. denied*, 519 U.S. 980, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996) (Chapel, J., specially concurring); *McGregor v. State*, 1994 OK CR 71, 885 P.2d 1366, 1383 n. 59, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995) (concurring by reason of *stare decisis*).

5. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). These cases set forth the minimum findings of intent or personal culpability necessary before capital punishment may be imposed.